UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RANDOLPH CARPENTER, Petitioner, | ) | |
| v. | ) | C.A. No. 06-222L |
| UNITED STATES OF AMERICA, Respondent. | ) | |

MEMORANDUM AND ORDER

Ronald R. Lagueux, Senior United States District Judge.

This matter is before the Court on Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence. For the reasons set forth below, Petitioner's Motion is denied.

I. Facts and Travel

On November 4, 2001, Petitioner was arrested after a traffic stop revealed a stolen firearm and marijuana in the car he was driving. On January 2, 2002, a federal grand jury returned a one-count indictment charging Petitioner with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The case was designated C.R. No. 02-03L. On April 24, 2002, Petitioner appeared before this Court with counsel Edward Manning and pled guilty to the one-count indictment. In exchange for Petitioner's guilty plea, the government agreed to recommend the lowest term of imprisonment derived from application of the guidelines, and agreed to recommend a three-point decrease for

acceptance of responsibility. At the change of plea hearing, the government offered the following recitation of the facts that would have been presented at trial:

> On November 4, 2001, officers from the Providence Police Department noticed a car driven by the defendant traveling at a high rate of speed that failed to stop at an intersection and use its turn signal. The officers stopped the vehicle and one of the -- one of them approached the passenger's side of the car. As the officer illuminated the defendant, the defendant accelerated his car away from the police. The officers chased the defendant in their vehicle until the defendant lost control of his own car and crashed into a fence. The defendant then fled on foot and was apprehended thereafter. Upon processing the scene of the crash, officers seized a 9 millimeter Luger from the front passenger seat area which the defendant had possessed while in the car. Prior to the defendant's possession of the firearm on November 4th, 2001, he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year.

(Change of Plea Hr'g Tr. 12-13, April 24, 2002.) When asked if he had anything he would like to add or subtract from the prosecutor's recital, Petitioner stated,

> I would just like to let the Courts know that the policeman at that -- that pulled me over that night was mistaken. He never, he never seen like the gun in my hand. The gun wasn't in my hand. But, to my knowledge I did know that the gun was in the car, was in the car. But I was like on, I was on drugs that night and I -- it kind of slipped my mind that it was in the car, but I kind of knew it was in the car, but I didn't possess it. I didn't have it in my hand at the time. But I did like know that it was in the truck.

(Change of Plea Hr'g Tr. 13-14.) After some questioning by this Court, Petitioner reiterated that he knew the gun was in the truck but that he didn't know where in the truck the gun was.

The Court was satisfied that Petitioner made a knowing and voluntary plea supported by an independent basis in fact, and thus accepted the plea.

Sentencing was scheduled for July 9, 2002 and a Presentence Investigation Report ("PSR") was prepared on July 1, 2002. The Prosecution Version presented in the PSR read as follows:

> On November 4, 2001, at approximately 2:00 a.m., Providence Police Department Officers Gregory Sion and Scott McGregor were patrolling the Lockwood Plaza Housing Development. Sitting in their marked police vehicle, the officers noticed a white Chevy Blazer traveling at a high rate of speed that did not stop at an intersection, or use its turn signal. The officers pulled behind the car, activating their overhead lights and siren. Carpenter pulled his car over, but the officers observed that Carpenter never placed the car in park. As a result, the officers did not place their vehicle in park as Officer McGregor walked towards the car. Through the passenger side window, McGregor noticed that Carpenter was holding an object in his right hand. McGregor illuminated Carpenter and observed that the object appeared to be a dark colored handgun. Apparently startled by the light, Carpenter accelerated his vehicle away form the police. A high speed car chase ensued. At some point, Carpenter lost control of his vehicle and collided with a fence. Carpenter crawled out the passenger side window, and ran down a grass embankment towards Interstate 95. Police chased after Carpenter, who ran across both the south and north travel lanes of the highway. Police observed a red pickup truck skid in order to avoid hitting Carpenter. Having made it across the highway, Carpenter jumped a fence on the north side of 95 and hid in the brush. Once police located him, Carpenter again attempted to flee by pushing at police and kicking. After a struggle, police placed him in handcuffs.
>
> After his arrest, police took Carpenter to the Rhode Island Hospital emergency room. The hospital triage assessment notes indicate that Carpenter informed hospital staff that he had taken an unknown quantity of

mushrooms and ecstasy earlier that evening. Carpenter's drug screening was positive for opiates.

Officers seized a 9MM German Luger and a bag of marijuana from the front passenger seat of the car Carpenter was driving. The gun was loaded with three 9MM Luger cartridges and five .380 caliber cartridges. A trace of the firearm revealed that it was stolen from a home in Milford, Massachusetts on August 9, 2001. Police were unable to lift any fingerprints from the scene.

On November 4, 2001, after his arrest and after reading and signing a waiver of rights form, Carpenter was interviewed by Detective Timothy O'Hara of the Providence Police Department. Carpenter informed O'Hara that he had been having problems on the street with members of the Lassiter family of Providence and an individual by the name of Dennis Morrow. Carpenter stated that he was shot at by Dennis Morrow a few weeks earlier in the Lockwood Housing Project area. Carpenter stated that he bought the gun he was arrested with to protect himself. When asked where he bought the gun, Carpenter informed Detective O'Hara that he bought the gun from Rashid Littlejohn.

The car that Carpenter was driving was rented from National Car Rental on November 2, 2001, by Cheryl Cordero. Agents from the Bureau of Alcohol Tobacco and Firearms interviewed Ms. Cordero. Ms. Cordero reported that she met Carpenter at a crack house on Armistice Boulevard in Providence. Ms. Cordero further stated that Carpenter offered her 3 ½ grams of crack cocaine in exchange for her rental of the car for a week. Carpenter paid for the rental of the car. Ms. Cordero knew Carpenter by the name of "Stu." Ms. Cordero was unable to identify Carpenter from a photopak, stating that at the time she met with Carpenter to give him the car she was high.

(July 1, 2002 PSR 1-3.) The PSR calculated that Petitioner had a total of 13 criminal history points, due largely to two prior convictions for possession of a firearm without a license and two convictions for possession of a controlled substance with intent

to distribute. These criminal history points established a criminal history category of VI for Petitioner, which is the top of the line. The offense level for this crime was calculated as 25 after the three-point reduction for acceptance of responsibility was taken into account. These calculations produced a guidelines range of 110 to 137 months of custody. However, because § 922(g)(1) provides a statutory maximum of 120 months of incarceration, the restricted guidelines range was 110 to 120 months.

On July 1, 2002, Petitioner filed with the U.S. Probation Office an Objection to the PSR in which he disputed several facts asserted in the PSR. In essence, Petitioner stated that he was not holding the gun when stopped by the police, that there was no high-speed chase before his arrest or any resistance on his part to arrest, and that he did not make the statements attributed to him post-arrest concerning his acquisition of the gun. Petitioner also objected to the probation officer's description of his statement of acceptance of responsibility and the inclusion of an enhancement for reckless endangerment in the calculation of the total offense level. The government responded to the objections with a Sentencing Memorandum filed July 8, 2002 by offering to present testimony at the sentencing hearing in support of the facts it asserted.

On July 8, 2002, Petitioner filed a motion to continue

sentencing so that he could gather affidavits regarding newly discovered evidence. The government did not object and sentencing was rescheduled for July 30, 2002.

On July 30, however, sentencing was again continued, this time at the government's request. The government wanted an opportunity to respond to Petitioner's Motion for Downward Departure, filed on the day of sentencing, July 30, 2002. In his Motion, Petitioner reiterated his objections to the facts asserted in the July 1, 2002 PSR, discussed above. Petitioner then moved for a downward departure from the guidelines range for two reasons. The first is difficult to disentangle: Petitioner cites that refusal to assist authorities in an investigation may not be considered an aggravating sentencing factor, and states that although no such refusal to assist fact has been asserted against him, the charge that he held the gun in his hand is a fabrication concocted by the police in retaliation for his refusal to assist them in a "sting."

The second reason Petitioner offers for downward departure is that he committed the offense while under a diminished capacity, pursuant to § 5K2.13 of the United States Sentencing Commission Guidelines Manual (2006). According to Petitioner, he learned while incarcerated that someone at the party had spiked the drinks with ecstasy, and that therefore he had ingested ecstasy involuntarily the night of his arrest.

At the hearing on July 30, 2002, the Court expressed its concern over Petitioner's late filing of a motion for downward departure, and granted government's request to continue sentencing. The hearing was rescheduled for September 27, 2002.

On August 23, 2002, the government filed its Opposition to Defendant's Sentencing Motions. In addition, on September 6, 2002, the government filed with the Court and with the U.S. Probation Office its Supplemental Sentencing Brief, in which it summarized (and appended in full) four recorded conversations Petitioner engaged in while incarcerated at the ACI. These transcripts reveal that Petitioner was working to convince his girlfriend and the woman who rented him the car he was driving to take responsibility for the gun charge. They also bring to light his belief that the reason the police pursued him that night was that someone he had been chasing reported him to the police. It becomes clear from reading the excerpts that Petitioner felt himself fortunate to have been intercepted before he found this individual, or he would now be in prison for murder. Petitioner also expressed how lucky he was to have crashed the car so that he was forced to flee without the gun. Because he left the gun behind, he reasoned out loud, the police did not find it in his possession, which allowed his girlfriend to claim the gun was hers.

The government, in its memorandum accompanying the

transcripts, argued that the conversations "conclusively reveal that [Petitioner] knew the gun was in the car on the night of his arrest." (Gov't's Supp. Sentencing Brief 3.) The government continued by noting that Petitioner had been representing to the Court and to the Probation Office that he never intended to exercise dominion and control over the gun, and these conversations prove those statements were false. Therefore, the government opined that Petitioner's representations concerning the gun constituted obstruction of justice, and pursuant to a provision in the guilty plea, the government was no longer obligated to recommend a three-point adjustment for acceptance of responsibility.

The Probation Office prepared a revised PSR on September 25, 2002, which included excerpts of the ACI conversations and a recalculated guidelines range. Specifically, the Probation Office included an adjustment for obstruction of justice, which increased the total offense level by two points. It also removed the adjustment for acceptance of responsibility, which increased the total offense level by three points. The total offense level for the revised PSR was therefore 30. A criminal history category of VI and a total offense level of 30 produces a guidelines range 168 to 210 months; however, the statutory maximum for § 922(g)(1) is 120 months. The revised guidelines range was therefore restricted to 120 months, rather than the

previously calculated 110 to 120 months.

Petitioner filed his objection to the revised PSR on November 18, 2002. In it, he argued that he should not be charged with the two points for obstruction of justice because the government misinterpreted the slang in the recorded conversations and also because the government was in possession of those tapes at the time of the change of plea hearing. In addition, Petitioner argued that he should not be penalized the three-point adjustment for acceptance of responsibility because he had indeed accepted responsibility for facts which show him guilty of constructive possession of the handgun; he merely objected to the additional facts the government included in the PSRs subsequent to his plea. Petitioner contended the government revoked its recommendation in retaliation for his Motion for Downward Departure.

Sentencing was continued until November 25, 2002. However, on November 18, 2002, Petitioner filed his Motion to Vacate Plea. In support of the Motion, Petitioner argued that the government was in possession of the transcripts of the ACI conversations in February 2002, that it discussed them with defense counsel and nonetheless accepted Petitioner's insistence that he never knew where the gun was when the parties went over the facts at the change of plea hearing. Petitioner added that his plea was invalid because he did not admit to sufficient facts to support a

conviction for constructive possession of a firearm. Petitioner then insisted that the government's introduction of the transcripts was retaliation for Petitioner's Motion for Downward Departure and an attempt to seek sentencing enhancements. The government responded with an Objection, arguing that Petitioner had not shown a valid reason to support a withdrawal of his plea and that the facts admitted to at the change of plea hearing did indeed support a conviction for constructive possession of a firearm.

The Court held a hearing to air these issues on November 25, 2002. This writer made clear that he was troubled by the truncated version of facts the government presented at the change of plea hearing compared with the extensive version offered for sentencing purposes. In a colloquy with defense counsel, the Court stated that if Petitioner went to trial and was convicted, he would likely face the statutory maximum, given his elevated criminal history category. The Court also emphasized that in order to submit his version of events the night of his arrest, Petitioner would probably have to testify, and that would put him at risk of incurring a two-point increase in offense level for obstruction of justice. The Court asserted,

> [i]f an expanded version of the alleged facts had been presented at the time of the plea, he would have disagreed with many of those and I wouldn't have taken the plea.
>
> And so in this circumstance, what's just and right is to give him an opportunity to defend this case and

> rather than my making credibility determinations, I will let the Jury make credibility determinations.
>
> I will tell you this is the first time in my whole career that I have granted a motion to vacate a plea but that's what I'm doing in this case because I want to see that justice is done.

(Mot. Hr'g Tr. 11, Nov. 25, 2002.) The Court concluded by granting Petitioner's Motion and placed the matter on the trial calendar.

Trial commenced on May 19, 2003, and concluded on May 22, 2003, with a guilty verdict returned by the jury. At trial, the sole issue before the jury was whether Petitioner had possession, actual or constructive, of the firearm seized from the car he had been driving. To show possession, the government presented testimonial evidence that Petitioner was holding the gun at the time of the traffic stop along with his post-arrest confession that he had purchased the gun for protection. Defense counsel countered this evidence by arguing to the jury that the police officers lied in their testimony, that the gun had been found elsewhere in the car but had been planted by the police on the front passenger seat. Because the car did not belong to Petitioner and no fingerprints were found on the gun, defense counsel asserted that the government had failed to meet its burden of showing possession. Petitioner did not testify at trial.

The jury returned a verdict of guilty and sentencing was scheduled for August 5, 2003. The PSR prepared for this

sentencing determined that Petitioner's total offense level was 30 and Petitioner was in criminal history category VI, just as the PSR prepared for September 25, 2002 had. The guidelines range these elements produced was 168 to 210 months, but 18 U.S.C. § 922(g)(1) dictated a statutory maximum of 120 months.

At sentencing, the Court imposed 120 months of incarceration to be served consecutively to the state sentence Petitioner was then serving. Petitioner appealed the conviction on the basis that the Court's response to a jury question at trial constituted an abuse of discretion. The First Circuit Court of Appeals found that any error was harmless given the strength of the government's case and denied Petitioner's appeal. United States v. Carpenter, 403 F.3d 9, 11 (1st Cir. 2005). The Supreme Court denied certiorari on May 16, 2005. Carpenter v. United States, 544 U.S. 1042 (2005).

Petitioner filed the instant Motion on May 15, 2006. In it, he raises three issues: first, he moves that this writer recuse himself because he lacks impartiality; second, he moves to vacate his conviction and sentence under a theory of ineffective assistance of counsel because his counsel refused to let him testify at trial; and third, he again moves to vacate his conviction and sentence due to ineffective assistance because his counsel failed to use the defense of intoxication at trial. Finally, Petitioner requests an evidentiary hearing to determine

the issues raised in his Motion.

## II. Standard of Review

To obtain relief under 28 U.S.C. § 2255, a petitioner must show that an error of law is jurisdictional, constitutional, or a fundamental defect which inherently results in a complete miscarriage of justice. Zanuccoli v. United States, 459 F. Supp. 2d 109, 111 (D. Mass. 2006)(citing Brecht v. Abrahamson, 507 U.S. 619, 634 n.8 (1993)).

Summary dismissal of a § 2255 petition is appropriate if it plainly appears from the face of the motion that the movant is not entitled to relief. Carey v. United States, 50 F.3d 1097, 1098 (1st Cir. 1995)(citing Rules Governing § 2255 Proceedings, Rule 4(b), 28 U.S.C.A. foll. § 2255). Genuine issues of material fact may not be resolved without a hearing; however, a hearing is not required where a § 2255 motion (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case. Carey, 50 F.3d at 1098. To dismiss a § 2255 motion without a hearing, a court must accept as true the allegations set forth by the petitioner "except to the extent they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." Myatt v. United States, 875 F.2d 8, 11 (1st Cir. 1989).

As Petitioner points out, the papers of a pro se litigant are held to less demanding standards than those drafted by lawyers. Boivin v. Black, 225 F.3d 36, 43 (1st Cir. 2000)(citing Haines v. Kerner, 404 U.S. 519, 520 (1972)). Nevertheless, pro se litigants are not excused from compliance with procedural rules or substantive law. Eagle Eye Fishing Corp. v. U.S. Dep't of Commerce, 20 F.3d 503, 506 (1st Cir. 1994).

## III. Discussion

### A. Hearing

Petitioner requests an evidentiary hearing to determine the issues he has presented as cause for vacating his conviction. Petitioners bear the burden of establishing that they are entitled to a hearing by a preponderance of the evidence. Owens v. United States, 236 F. Supp. 2d 122, 143-44 (D. Mass. 2002)(citing Myatt v. United States, 875 F.2d 8, 11 (1st Cir. 1989).

In requesting a hearing, Petitioner has failed to submit any factual disputes that might require an evidentiary hearing for resolution. Petitioner appends his affidavit to this Motion, which consists of a narrative of the events of the night of his arrest purporting to show he was not the owner of the gun. The last few paragraphs assert that Petitioner told his counsel of potential witnesses who would corroborate his version of events

and that he told his counsel he wanted to testify on his own behalf at trial. Petitioner then recounts that his counsel refused his request to testify "because it would hurt [Petitioner] because [he has] other gun charges." (Pet'r's Aff. ¶ 12.)

None of the factual assertions in the affidavit show the Court by a preponderance of the evidence that a factual dispute remains to be resolved at a hearing. Little of the affidavit is even relevant to the issues raised in the Motion. The claims of judicial recusal and ineffective assistance of counsel due to a failure to use an intoxication defense are completely unaddressed by the affidavit and can be resolved on the face of the record, transcript and other relevant papers. The claim of ineffective assistance of counsel due to refusal to allow Petitioner to testify, while referred to in the affidavit, requires no further fact-finding, and can be resolved by reference to the record and transcript.

Ultimately, Petitioner's assertions do not introduce a material factual dispute requiring a hearing and Petitioner's request for a hearing is therefore denied. Accordingly, the Court will look to the record and files of the case along with Petitioner's allegations to resolve Petitioner's Motion. In so doing, the Court will accept as true all of Petitioner's allegations except to the extent they are contradicted by the

record, inherently incredible, or conclusions rather than statements of fact. Myatt v. United States, 875 F.2d 8, 11 (1st Cir. 1989).

**B. Recusal**

Petitioner requests that this writer recuse himself pursuant to 28 U.S.C. § 455. That section provides, in pertinent part, that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).

In the First Circuit, the test for determining whether a judge's impartiality might reasonably be questioned is

> whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonable man.

United States v. Cowden, 545 F.2d 257, 265 (1st Cir. 1976). Courts insist that there be a factual basis for the claim that there appears to be a lack of impartiality. United States v. Voccola, 99 F.3d 37, 42 (1st Cir. 1996). Unless a party can establish a reasonable factual basis to doubt a judge's impartiality "by some kind of probative evidence," then a judge must hear a case as assigned. Id. (quoting Blizard v. Frechette, 601 F.2d 1217, 1221 (1st Cir. 1979).

In this case, Petitioner claims that a "personal bias or

prejudice against Petitioner" warrants recusal (Pet'r's Mem. Supp. § 2255 Mot. 4.) Petitioner cites the following comments made at the November 25, 2002 hearing concerning Petitioner's motion to withdraw his guilty plea as indicative of bias:

> I want your client to understand that if he goes to trial and he is convicted, that the chances are he will get the statutory maximum here, ten years and it will be served consecutively to the State term that he is serving. (Mot. Hr'g Tr. 5, Nov. 25, 2002.)
>
> I want him to understand that if he's got a chance of acquittal in this case, it is probable that he's going to have to take the witness stand and testify. (Mot. Hr'g Tr. 6.)
>
> So he is running the risk of not only losing the three points downward for acceptance of responsibility but also running the risk of having two points added for obstruction [of] justice. (Mot. Hr'g Tr. 7.)
>
> I will tell you this is the first time in my whole career that I have granted a motion to vacate a plea . . . . (Mot. Hr'g Tr. 11.)

Petitioner argues that these statements "call into question the Court's impartiality and ability to conduct a fair sentencing hearing and to properly advise the Petitioner on his right to testify." (Pet'r's Mem. Supp. §2255 Mot. 5.) Petitioner further contends that these statements unfairly put him in a "catch-22 situation," in which Petitioner could have chosen to testify and face a heightened sentence or could have opted not to testify and lose his only chance at acquittal.

The Supreme Court has analyzed the words "bias or prejudice," as used in the recusal context, and found that they

"connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . . , or because it is excessive in degree . . . ." Liteky v. United States, 510 U.S. 540, 550 (1994). The Liteky Court acknowledged that

> [t]he judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.

Id. at 550-551. Recognizing the efforts required for ordinary courtroom administration, the Liteky Court determined that comments made by a judge during judicial proceedings are rarely grounds for disqualification. Id. at 555.

In this case, the statements referred to by Petitioner were made during a hearing regarding Petitioner's motion to vacate his guilty plea and were meant to instruct Petitioner about the consequences of withdrawing his plea and undergoing a trial. It was necessary that Petitioner understand the possible sentence he might receive, and the difficult choice ahead of him regarding whether to testify, in order to make an informed choice concerning withdrawal of his plea. While this writer's statements may have been cryptic, they were realistic assessments

of his prospects considering his situation. Petitioner was not in an unusual position for a criminal defendant, and there was nothing directed at Petitioner personally in this writer's explanation of the circumstances. Because the statements were made during a court proceeding and were neither excessive in degree nor based on knowledge this writer should not have had, no reasonable person would question the Court's impartiality based on the statements Petitioner has offered. Moreover, Petitioner never moved to recuse before or during trial or before or during the sentencing hearing. To so move now is clearly an afterthought and an attempt at judge shopping. The motion to recuse is frivolous and, therefore, is denied.

**C. Ineffective Assistance of Counsel**

Petitioner makes two ineffective assistance of counsel claims: first, that counsel failed Petitioner when he refused to allow him to testify on his own behalf; second, that counsel was ineffective in failing to use an intoxication defense.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate by a preponderance of the evidence that (1) his counsel's performance fell below an objective standard of reasonable professional assistance, and (2) that it was so prejudicial as to undermine confidence in the outcome of the trial. Strickland v. Washington, 466 U.S. 668, 687-88 (1984).

In determining this question, the habeas court must evaluate the challenged conduct from counsel's perspective at the time, considering the totality of the circumstances before it, and making every effort to eliminate the distorting effects of hindsight. Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993)(citations and internal quotation marks omitted.) Moreover, the court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Lema, 987 F.2d at 51 (citations and internal quotation marks omitted).

i. Refusal to Allow Petitioner to Testify

Petitioner asserts that his failure to testify came about as the result of a conversation with his counsel in which he insisted that he be allowed to testify and his counsel refused. Counsel's position, according to Petitioner, was that Petitioner's prior gun convictions would come out in cross-examination and would prevent the jury from crediting the defense theory that Petitioner did not know about the gun in the car and that the police officers lied. (Pet'r's Mot. Supp. § 2255 Mot. 7.) Petitioner reports that his attorney told him that in these circumstances, the lawyer decides how the case will be presented and which witnesses will be called, and that in this case, he had

decided Petitioner would not be testifying.

The government has presented evidence that this exchange did not go as Petitioner claims. Petitioner's counsel, in a letter sent to the Assistant U.S. Attorney on June 9, 2006, denies he ever instructed Petitioner not to testify. (Govt's Mem. Supp. Obj'n to Pet'r's Mot. 18, Ex. A.) Nevertheless, the Court will take Petitioner's version of events as true in order to test the validity of his claim according to the precepts of summary disposition of a § 2255 claim pursuant to Myatt v. United States, 875 F.2d 8, 11 (1st Cir. 1989).

The Supreme Court has treated the right to testify in one's defense as a fundamental constitutional right, though it has never explicitly defined its status. See, e.g., Rock v. Arkansas, 483 U.S. 44, 53 n.10 (1987). See also Lema v. United States, 987 F.2d 48, 52 (1st Cir. 1993)(listing cases).

The First Circuit has adopted the cautious approach of "assuming without deciding" that the right of a criminal defendant to testify on his own behalf is fundamental. Lema, 987 F.2d at 52. Whether this fundamental status requires a distinct analysis apart from the Strickland ineffective assistance test is an open question in this Circuit. See, e.g., Owens v. United States, 236 F. Supp. 2d 122, 142-43 (D. Mass. 2002)(applying Strickland); Passos-Paternina v. United States, 12 F. Supp. 2d 231, 240 (D.P.R. 1998), aff'd 201 F.3d 428 (1st Cir.

1999)(applying constitutional trial error analysis). The Passos-Paternina court usefully synthesized the First Circuit's approach in Lema v. United States, 987 F.2d 48 (1st Cir. 1993), Siciliano v. Vose, 834 F.2d 29 (1st Cir. 1987), and United States v. Systems Architects, Inc., 757 F.2d 373 (1st Cir. 1985) into a three-pronged analysis. The multivariate test requires a court to address a petitioner's claim that he was deprived of his right to testify through the following procedure: (1) the court should assume that a criminal defendant, by not attempting to take the stand, has knowingly and voluntarily waived his right to do so; (2) the court must determine if the habeas petitioner has alleged sufficiently specific facts to rebut the initial presumption of waiver; and (3) if the court does find that petitioner has successfully rebutted the presumption of waiver, it must analyze his claim as one for constitutional trial error and apply "harmless error" analysis.[1] Id. at 238-40.

In this case, Petitioner was silent at trial and therefore, the first prong of the analysis requires this Court to assume he

---

[1]In affirming Passos-Paternina, the First Circuit noted the court's application of constitutional trial error analysis instead of the Strickland prejudice test to petitioner's claim of the denial of his right to testify. Passos-Paternina v. United States, 201 F.3d 428 (1st Cir. 1999). The court stated it need not decide which of the two standards is appropriate, given that both ask a court to look at whether the defense was prejudiced by the denial of the right. Because the question remains open in this Circuit, the Court follows Passos-Paternina in applying the constitutional trial error analysis, recognizing that it may be a distinction without a difference.

voluntarily waived his right to testify. As the second step of the analysis, the Court must ask whether Petitioner has submitted sufficient facts to rebut that presumption. In order to successfully overcome the assumption of waiver, a petitioner must allege more than "mere conclusory allegations." Id. at 239. Rather, "a petitioner must first allege specific facts from which a court could reasonably find that trial counsel told the petitioner that he was legally forbidden to testify or in some similar way compelled him to remain silent." Id. (internal quotation marks omitted). He must also demonstrate, from the record, that those specific factual allegations would be credible. Id.

In his affidavit, Petitioner swears that he told his counsel he wanted to testify, and that his counsel refused because of his prior gun convictions. Petitioner then avers that he said he would take responsibility for those, and his counsel replied, "no I can't let you do that." (Pet'r's Aff. ¶ 12.) While the Court is not convinced that these facts rise to the level of particularity indicating compulsion on the part of Petitioner's counsel, it will proceed to the last step of the analysis to address the substance of Petitioner's claim.

Under Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993), the same "harmless error" analysis used in a direct appeal is to be applied in collateral review of trial-type constitutional error.

That "harmless error" analysis is governed by Kotteakos v. United States, 328 U.S. 750, 776 (1946), which instructs courts to determine whether the trial error "had substantial and injurious effect or influence in determining the jury's verdict." Under this standard, "habeas petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637.

In this case, Petitioner offers in affidavit form the testimony he would have presented had he been permitted to take the stand. His proffer is that, on the night he was arrested, he was at a party "drinking, smoking weed, taking pills and using mushrooms." (Pet'r's Aff. ¶ 1.) Someone at the party brandished a gun, which was eventually put into a friend's truck. Petitioner later borrowed that truck to procure marijuana, and it was then that the police pulled him over. He fled the police, he explains, because he was very intoxicated and nervous about a suspended sentence in state court. Petitioner, in offering this version of events, suggests that he did not know the gun was in the truck, and that he did not hold the gun to his chest at the traffic stop, as the police had testified at trial. He also insists that he never told the police he had bought the gun for protection.

Petitioner's version of events is simply not credible when taken in light of the record. Petitioner would like a jury, and

this Court, to credit his testimony concerning events that occurred while he was very intoxicated. In addition, Petitioner has two prior convictions for possession of a firearm as well as two prior convictions for possession with intent to deliver controlled substances, and most likely, this would have come out in cross examination. Moreover, the government likely would have introduced transcripts of conversations recorded at the ACI in which Petitioner discusses whether others might take responsibility for the gun charge for him. These facts clearly would have been fatal to Petitioner's credibility in the eyes of the jury. Petitioner's testimony was unlikely to aid him in his defense and was much more likely to hurt him, as his counsel advised him. Given the likely damage that testifying would have done to Petitioner's case, it is clear that Petitioner has not met his burden under Brecht of showing "actual prejudice" as a result of the trial error.

The evidence of guilt presented at trial by the prosecution was overwhelming. If Petitioner had testified to rebut this evidence, he would have been thoroughly impeached by the ACI tape, which the prosecution was obviously holding in reserve for just such impeachment purposes. In addition, the jury would have heard Petitioner admit on tape that he was fortunate to have been arrested before he used the gun to commit murder. Therefore, the Court concludes that any error that might have occurred when

Petitioner was told by his counsel not to testify was harmless.

ii. Failure to Raise an Intoxication Defense

Petitioner also faults his attorney for failing to defend against the charge of felon in possession of a firearm with the fact of Petitioner's intoxication at the time of his arrest. The fact that his counsel did not secure an expert on substance abuse to support Petitioner's claim that he was suffering from an incapacitating intoxication was also cited by Petitioner as indicative of ineffective assistance.

In examining an ineffectiveness claim based on failure to raise a specific defense, the Court looks not at whether the attorney should have raised such a defense, but whether the attorney's investigation supporting his pursuit of the defense was itself reasonable. Dugas v. Coplan, 428 F.3d 317, 328 (1st Cir. 2005)(citing Wiggins v. Smith, 539 U.S. 510, 523 (2003)).

The government is quick to point out that the defense of voluntary intoxication is no defense to a general intent crime, and that while the First Circuit has not addressed the issue, the circuit courts which have considered the question have all held that the charge of felon in possession of a firearm is a general intent crime. See, e.g., United States v. Newsom 452 F.3d 593, 606 (6th Cir. 2006); United States v. Wolfe, 10 Fed. Appx. 115 (4th Cir. 2001); United States v. Reed, 991 F.2d 399, 401 (7th Cir. 1993).

However, the Sixth Circuit, in Newsom, held that the theory of constructive possession in a felon possession of a firearm charge *does* require specific intent. 452 F.3d at 606 ("the particular theory upon which the government bases its case against [Defendant] -- that of constructive possession -- does require specific intent.")

In this case, the requirement of specific intent on a theory of constructive possession plays no part. At trial, the government introduced evidence of actual and constructive possession of the firearm, and did not limit itself to one theory alone, as the prosecutor in Newsom had. The jury found Petitioner guilty of possession and was not asked to indicate under which theory it so found. There was certainly sufficient evidence of actual possession of the firearm to support such a finding. Because the government did not base its entire case on constructive possession, a showing of specific intent was not required to determine whether Petitioner possessed the firearm. Therefore, the defense of intoxication would have been of no value to Petitioner at trial.

This Court cannot reconstruct Petitioner's counsel's investigation into the facts of Petitioner's intoxication, but it concludes from the record that he was well aware of Petitioner's condition at the time of his arrest. Counsel's decision not to pursue this defense, in light of the minimal effect it might have

had on the finding of possession and the destructive effect it was more likely to have on the jury's view of Petitioner, is clearly reasonable. As the First Circuit has noted, "[c]ounsel is not required to pursue every path until it bears fruit or until all available hope withers." Genius v. Pepe, 147 F.3d 64, 67 (1st Cir. 1998)(quoting Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir. 1984)). Because this Court has determined that counsel's decision not to pursue an intoxication defense was reasonable, it cannot say that his conduct fell below an objective standard of reasonable professional assistance. Petitioner's request to vacate his conviction and sentence based on the failure of his counsel to raise an intoxication defense, therefore, is denied.

## IV. Conclusion

For the foregoing reasons, Petitioner's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 is denied.

It is so ordered.

Ronald R. Lagueux

Ronald R. Lagueux
Senior United States District Judge
March 22, 2007